Jasen, J.
The issue before us is whether the State Commissioner of Human Rights, having found that an educational institution denied a professor tenure on the basis of a discriminatory classification, may order the institution to grant the offended employee tenure. We conclude that, while the commissioner may have this power in the abstract, its employment must be carefully restricted to only the most extraordinary of situations.
Dr. Laura Canuto was hired in 1969 by the New York Institute of Technology, a private educational college, to serve as an assistant professor of physics. At the time, the physics department of the Institute’s Manhattan campus, where Dr. Canuto was assigned, consisted of seven faculty members, including one other female professor. In 1971, Dr. Canuto was promoted to the position of associate professor and the following year was first considered for tenure. Pursuant to the provisions of a collective bargaining agreement with its faculty, the Institute grants tenure only after the applicant has been approved by a series of faculty committees, whose recommendations are reviewed by the president of the Institute. The president submits his own recommendation along with the recommendation of the faculty to the board of trustees which has the sole power to grant or deny tenure. The tenure provisions also stipulate that a faculty member who has taught at a college level for a total of seven years, including three years at the Institute, must be granted tenure or terminated. Dr. Canute’s application for tenure in the 1972-1973 academic year was approved by three faculty committees, but was disapproved by the final faculty level review committee, *320 the college-wide committee. The next year she was approved by two committees, with the third committee changing its position and recommending denial of tenure. Dr. Canuto took an internal appeal of the latter determination, which was denied on the ground that "the Physics department has been shrinking and no place was available for Dr. Canuto”. Since Dr. Canuto had taught at the college level for seven years and at the Institute for three without receiving tenure, she was given a terminal contract to teach for one final year.
Dr. Canuto filed a complaint with the State Division of Human Rights alleging that the Institute and certain members of its administration had discriminated against her by denying her tenure because she was a woman. After a hearing, the Commissioner of Human Rights found that, although the individual administrators had not committed any unlawful discriminatory acts, the Institute itself had "committed an unlawful discriminatory practice in denying Complainant, because of her sex, an opportunity to qualify for tenure.” The commissioner directed that the Institute "restore the Complainant to the position of Associate Professor in the Math-Physics Department with tenure” (emphasis added) and ordered that the Institute pay to Dr. Canuto a sum of money "as back pay” representing the amount of money she would have earned had she been retained on the faculty after the expiration of her terminal contract. The State Human Rights Appeal Board unanimously affirmed the order.
The Institute initiated a review proceeding in the Appellate Division, First Department. (Executive Law, § 298.) The division cross-petitioned for enforcement of its order. In its petition for review, the Institute alleged that the finding of discrimination was not supported by substantial evidence and that the administrative agency had erred in finding that Dr. Canuto had been discriminated against. Although the petition for review did not contest the breadth of the commissioner’s order and though no complaint had been made at either the commissioner or the Appeal Board level, in its brief to the Appellate Division the Institute argued that the commissioner’s order that tenure be granted Dr. Canuto was overly broad. Both the Division of Human Rights and Dr. Canuto filed briefs contending that the commissioner’s order was, in all respects, valid and lawful. The Appellate Division confirmed the determination of the Appeal Board, stating, in a Per Curiam opinion, that there was a factual basis for the *321 finding of sex discrimination and that the remedy selected by the division was reasonably related to the discriminatory practice found to exist and to the legislative policy behind the statute. (48 AD2d 132, 134.)
On this appeal the Institute no longer questions the sufficiency of the evidence supporting the division’s finding of discrimination. The Institute’s arguments are addressed solely to that portion of the commissioner’s order that directs the granting of tenure to Dr. Canuto. At the threshold, we must consider the contention of Dr. Canuto that the issue of the breadth of the commissioner’s order has not been adequately preserved for our review. The record before us bears no indication that any objection to the tenure order was made before the commissioner or the Appeal Board. As previously noted, the point was not raised in the petition for review, although it was briefed to the Appellate Division. The Human Rights Law provides for initial judicial review of Appeal Board orders by the Appellate Division. "No objection that has not been urged in prior proceedings shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.” (Executive Law, § 298.) The Appellate Division treated the issue on its merits and, thereby, exercised the discretionary power conferred by statute to overlook a failure to object where the situation warrants. Where the Appellate Division has implicitly exercised its statutory authority to review a question of law, regardless of the absence of a timely objection, particularly where that court also had before it a cross petition for enforcement, we may not later declare that the issue has not been preserved. (Cf. Matter of Holland v Edwards, 307 NY 38, 47.) Although not determinative, we note that the State Division of Human Rights, in its brief, does not raise the technical issue, suggesting that the division would prefer to have us issue an adjudication of its authority so that its future course might be clear. It has been the consistent policy of this court, although in a different context, to rule on matters of great public significance, particularly where the case entails construction of broad statutory language, despite technical flaws in the record reaching this court. (See, e.g., Matter of National Organization for Women v State Div. of Human Rights, 34 NY2d 416, 419.) In light of the Appellate Division’s resolution on the merits and since this case involves a question of far-reaching public importance concerning an issue of *322 statutory interpretation of which the administering agency seeks final judicial resolution, we believe it proper to consider the merits of this appeal.
The university occupies a unique and vital role in modern American society. To the universities, public as well as private, is assigned the task, arduous as it might be, of educating the young with the skills or concepts conducive to fulfillment in our increasingly complex society. Not only is the university entrusted with the responsibility for providing rote knowledge and technical expertise, it is also relied upon to assist students in developing the capacity for independent, critical thought and examination, a capacity that will serve not only in future commercial endeavors, but will enable students to take an active part in shaping the future development of our democratic society. Vital as this task might be, the university has other significant functions. The university serves as a cultural treasure house where the knowledge of the past can be studied, the beauties of art and literature appreciated, and research conducted to increase mankind’s store of knowledge and help to construct a better world and uplift the human spirit. The university is a place where questions should be freely asked and where answers, perhaps, can be found.
The management of the university is primarily the responsibility of those equipped with the special skills and sensitivities necessary for so delicate a task. One of the most sensitive functions of the university administration is the appointment, promotion and retention of the faculty. It is for this reason that the courts, and administrative agencies as well, should "only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure, especially in institutions of higher learning.” (Matter of Pace Coll. v Commission on Human Rights of City of N. Y., 38 NY2d 28, 38; see, also, Faro v New York Univ., 502 F2d 1229, 1231-1232.) As we said in Pace College, educational institutions "are not 'businesses’ where employees are all fairly fungible unskilled or semiskilled workers”, but are places where "subjective judgments necessarily have a proper and legitimate role”. Matter of Pace Coll. v Commission on Human Rights of City of N. Y., supra, p 38.)
One of the most critical of campus choices is the determination of whether specified faculty members should be tenured. Historically, tenure systems developed as a means to protect *323 academic freedom. In order for the institution to achieve its purposes, "a pall of orthodoxy” cannot be cast over the classroom. (See Keyishian v Board of Regents, 385 US 589, 603.) Without some position security, professors could be discharged for hidden ideological reasons. A tenure system not only protects individual professors, but serves to provide economic security to the entire faculty so that they might pursue their studies without the fear of intellectual reprisal. (See Developments in the Law—Academic Freedom, 81 Harv L Rev 1045, 1048-1049.) Although statutory tenure systems vary from State to State and private tenure programs differ between private institutions, in all forms tenure encompasses a basic continuity of service; the employing institution has relinquished some of its power to discharge the members of its faculty. (Byse, Academic Freedom, Tenure and the Law: A Comment on Worzella v Board of Regents, 73 Harv L Rev 304, 305-306.) Generally, tenured professors may be discharged only for cause and only with some measure of procedural due process. (See Matheson, Judicial Enforcement of Academic Tenure: An Examination, 50 Wash L Rev 597; cf. Education Law, § 6206, subd 12.)
Although permanency of employment has advantages, it has its evils as well. With employment secured permanently, an incentive for diligence disappears. Tenure can provide a haven for competent, though dull and unimaginative, instructors. At worst, tenure may protect the marginally competent from replacement by the more qualified. Moreover, tenure tends to freeze the university into a designated number of faculty positions in each academic department. For example, if two young mathematics professors with similar specialties are granted tenure at a prestigious university today, the university must act on the reasonable likelihood that they will still be there 30 years later, though the university may no longer require two instructors with the same technical expertise. Thus, tenure is not an item lightly to be conferred, for the granting of tenure is likely to shape the university’s future for years to come.
We note also that the massive college enrollments of the 1960s have receded in the 1970s. Institutions which were growing at a furious pace only a few years ago are now, equally furiously, retrenching. The effects of economic recession have placed special burdens on private institutions which must rely primarily on endowments and tuition. At the New *324 York Institute, for example, student enrollment fell from 4,255 in 1968 to 3,096 in 1972, a loss of over one quarter of the student population. The Institute sustained a financial loss of $3,000,000 in 1971 and of $1,500,000 in 1972, and now must sell some of its real estate holdings in order to balance its budget. The existence of tenured positions is an obvious impediment to the reduction of a faculty that had expanded with the Institute itself and which is now larger than the Institute’s needs warrant.
With these considerations in mind, we turn to the issue immediately before us: whether the Division of Human Rights can compel a university, as a remedy for past discrimination, to grant a particular professor tenure. The Human Rights Law authorizes the Commissioner of Human Rights to direct an offending party to take affirmative action to cure the effects of discrimination. The commissioner is given broad authority, including, but not limited to, the power to require "hiring, reinstatement or upgrading of employees, with or without back pay, restoration to membership in any respondent labor organization, admission to or participation in a guidance program, apprenticeship training program, on-the-job training program or other occupational training or retraining program, the extension of full, equal and unsegregated accommodations, advantages, facilities and privileges to all persons, granting the credit which was the subject of any complaint” and the "awarding of compensatory damages to the person aggrieved” by a discriminatory practice. (Executive Law, § 297, subd 4, par c, els [ii], [iii].) It is apparent that the Legislature was addressing the general business and industrial sphere rather than highly professional fields requiring special expertise, such as education. Nevertheless, we do not now conclude that the commissioner is totally without authority to direct an educational institution to grant an offended teacher tenure. The State’s strong and important public policy against discrimination and the need for "programmatic enforcement of the anti-discrimnation laws” has led the Legislature to vest broad authority in the commissioner so that he may take "appropriate action to eliminate and prevent discriminatory practices.” (See, e.g., Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights, 35 NY2d 143, 146; Gaynor v Rockefeller, 15 NY2d 120, 132.) Since the Human Rights Law should be liberally construed in order to accomplish its purposes (Matter of City of *325 Schenectady v State Div. of Human Rights, 37 NY2d 421, 428), we assume that in a proper case the commissioner may require the granting of tenure.
Although the commissioner has a wide discretion in selecting an appropriate remedy, there are times where his determination of a remedy may be set aside because it is "erroneous as a matter of law”. (Cf. Matter of Mize v State Div. of Human Rights, 33 NY2d 53, 56.) As previously noted, tenure decisions require the careful balancing of both objective criteria and legitimate subjective considerations. In considering the attributes of a given professor, the governing authority of the university, or its delegatees, must go beyond the academic competence of the instructor. To achieve a balance in the specific department, as well as in the university as a whole, the institution must weigh the professor’s potential academic contributions, field of academic specialization, and the aspects of particular individual competence. Even more importantly, careful thought must be given to the present and future needs and requirements of the specific department and of the total university itself. (See Developments in the Law—Academic Freedom, 81 Harv L Rev 1045, 1101.) The responsibility for making this assessment cannot lightly be taken away from the institution and given to the Commissioner of Human Rights, an official of the State whose viewpoint and interest is considerably narrower than that of the institution and who, above all, is not a professional educator. Only under the gravest of circumstances, where all other conceivable remedies have proved ineffective or futile should the commissioner enter the campus to impose the conferring of tenure.
The present litigation serves as an excellent illustration. The commissioner found that Dr. Canuto was denied, because of her sex, "an opportunity to qúalify for tenure”. The obvious direct remedy is not to grant her tenure immediately, but to require the institution to consider her application for tenure without discriminating against her. Temporary reinstatement and an award of back pay may also be provided for, as was done in this case. While Dr. Canuto is entitled to be fairly considered for tenure, she is not entitled to tenure per se. Thus, in this case, the imposition of tenure is not reasonably related to the discrimination found to exist. (See Matter of Holland v Edwards, 307 NY 38, 46, supra.) In the event that the institution willfully fails to purge itself of the discriminatory taint, then, perhaps, the commissioner might consider the *326 appropriateness of ordering tenure. Only where the institution’s tenure procedures are irreparably tainted and further recourse to them would be futile, rendering a fair consideration impossible, might the commissioner consider bypassing the normal university channels. However, even if Dr. Canuto is again denied tenure, the second denial, by itself, would not necessarily establish a discriminatory practice on the part of the Institute for there may be valid reasons for denying Dr. Canuto tenure. Moreover, even in the extraordinary case where a grant of tenure might serve as an appropriate remedy, the commissioner should not impose such a requirement without consulting with the administration of the institution and without considering the effect of such an order on the institution and its faculty.
On this record, we conclude that there is no showing of circumstances of sufficient gravity to justify the imposition of tenure. At this point we know only that Dr. Canuto was not given a fair opportunity to apply for tenure. We believe that this alone is insufficient to justify imposition of a tenure requirement. In the absence of a showing that there are grave circumstances in this case, the tenure requirement should be deleted from the order. We do not, however, on the basis of this holding, proceed then to assume the prerogative which belongs to the commissioner, subject to judicial review, to fashion the particular remedial provisions and requirements for affirmative action, short of the imposition of tenure, appropriate in this instance to redress the conceded discrimination and to effectuate the purposes of the Human Rights Law. These are matters for reconsideration and determination by the commissioner.
Accordingly, the order of the Appellate Division should be reversed and. the case remitted to the Appellate Division for a remand to the State Division of Human Rights for further proceedings not inconsistent with this opinion.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order reversed, without costs, and matter remitted to the Appellate Division, First Department, for further proceedings in accordance with the opinion herein.