Barbara MELING, Plaintiff,

v.

ST. FRANCIS COLLEGE and Donald Sullivan, Defendants.

No. 95–CV–3739 (JG).

United States District Court,
E.D. New York.

March 31, 1998.

Lee F. Bantle, Jonathan S. Abady, Beldock, Levine & Hoffman, LLP, New York City, for Plaintiff.

Thomas G. Dignan, James P. O'Brien, Jr., Nixon, Hargrave, Devans & Doyle, LLP, Garden City, NY, for Defendants.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

On July 7, 1997, a jury returned a verdict for Barbara Meling on her claims that she was terminated from her employment with St. Francis College ("St.Francis") because of her physical disabilities, in violation of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (the "ADA"), the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq., and other related state anti-discrimination statutes. The jury awarded Meling $225,000 in compensatory damages and $150,000 in punitive damages.

Pending before me now are (1) defendants' motion for judgment as a matter of law or for a new trial; (2) defendants' motion to set aside the jury's award of punitive damages; (3) defendants' contention that I should refuse to award back pay or, in the alternative, that the back pay award be subject to certain offsets; and (4) plaintiff's request for an order requiring St. Francis to reinstate[1] Meling with tenure. For the reasons set forth below, the jury's liability and damage verdicts shall remain undisturbed; Meling is also awarded $141,251, plus interest, in back pay, and Meling is reinstated without tenure to her position on the faculty at St. Francis. Meling shall have until April 10, 1998, to supplement her application for back pay for the period of time from the trial to now.

### FACTS

Meling was hired by St. Francis as a physical education instructor on September 1, 1988. By that time, Meling had obtained a Master's Degree in Physical Education from Manhattan College,[2] and had worked for two years as a physical education teacher for children from grades seven through twelve. A martial arts expert, Meling holds a fourth-degree black belt in Tae Kwon Do.

St. Francis and Meling initially agreed to a one-year contract of employment. Following annual reviews of her job performance, St. Francis offered, and Meling accepted, three subsequent one-year contracts. In September 1992, St. Francis promoted Meling to Assistant Professor and they entered into a three-year contract. As a full-time Assistant Professor of Physical Education, Meling supervised student teachers and taught a variety of courses, including "Care and Prevention of Athletic Injuries," "Exercise, Nutrition and Weight Control," "History and Principles of Physical Education" and "Tae Kwon Do." Most of the courses Meling taught were strictly lecture courses, requiring no physical exertion on her part. Others, such as Tae Kwon Do, required either Meling or a student assistant to demonstrate certain skills. Faculty members and the administration considered Meling an excellent professor, who taught well and created a stimulating learning environment.

On March 22, 1993, while Meling was driving on the Major Deegan Expressway in the Bronx, New York, a car crashed into the rear of her vehicle. Meling suffered a variety of injuries: a concussion, multiple fractures of her cheek bones and eye orbits, a nasal bone fracture, whiplash and damage to her shoulder and knee. Despite these injuries and the difficulties they created for her, Meling continued to teach at St. Francis during the balance of the Spring 1993 semester.

Throughout the summer of 1993, Meling experienced severe headaches, and she spent most of her time in bed. She attempted to return to work at St. Francis in the fall of 1993. However, the pain in her shoulder and knee, which restricted her ability to stand, sit, walk and reach, led her to request medi-

---

1. At the conclusion of the trial, I expressed to the parties my inclination, based on the evidence, to order Meling's reinstatement to her position at St. Francis. Neither side argued against reinstatement at that time, in the post-trial submissions, or at oral argument of these motions. The only issue in this regard is whether the reinstatement should be to a tenured position.

2. In May 1994, Meling received a Ph.D in Physical Education from Columbia University.

cal leaves of absence from St. Francis for the Fall 1993 and Spring 1994 semesters. St. Francis granted Meling's requests.

While Meling was on medical leave, she engaged in an extensive physical therapy program and had surgery on her shoulder and fractured eye orbits. Her goal was to return to work at St. Francis in the fall of 1994. When Meling communicated this hope to John Hawes, the academic dean at St. Francis, he told her that she "would have to be able to return to full duties and full responsibilities" and the school "would not accept [her] back with limitations." Tr. at 82.[3]

On July 27, 1994, Meling met with Donald Sullivan, the President of St. Francis, and requested disability leave for the Fall 1994 semester because she wanted to undergo corrective surgery for accident-related sinus problems. Sullivan rejected Meling's request, stating that, under Section J(4)(c) of the St. Francis Faculty Handbook, Meling could not remain on medical leave.[4] In those circumstances, Meling agreed to postpone her surgery and to resume her teaching responsibilities for the Fall 1994 semester.

St. Francis requested a letter from Meling's physician indicating whether Meling was physically able to return to work, and Meling provided one. In that letter, Dr. Louis Starace, Meling's treating physician, advised St. Francis that Meling could not engage in "strenuous physical activities," but she could return to work for "light duty only," which could include "teaching courses of a non physical nature—lecture only." By letter dated August 30, 1994, St. Francis informed Meling that "the schedule you have been assigned requires strenuous physical activity and [we are] unable to provide you with a schedule which is light duty only."

In a letter dated September 1, 1994, Meling urged St. Francis to reconsider its decision, and she proposed accommodations that

would have enabled her to teach physical education at St. Francis during the Fall 1994 semester. For example, Meling proposed that she (1) work on the physical education curriculum; (2) serve on faculty committees; (3) advise students; and (4) be provided with an assistant when teaching courses which required the demonstration of skills.

On September 7, 1994, Sullivan reviewed Meling's September 1 letter setting forth her proposed accommodations. On that same day, Sullivan wrote back, stating that it was too late to implement any of the accommodations that she suggested, "even if they were appropriate." In addition, Sullivan stated, St. Francis had already replaced Meling with two adjunct instructors, since St. Francis was "doubtful that someone physically limited could qualify as a proper supervisor for a physical education course." Tr. at 99.

Neither Sullivan nor anyone else at St. Francis spoke to Meling about the courses she was scheduled to teach, the methods for teaching those courses, or whether those courses required any physical exertion at all. In addition, no one from St. Francis discussed with Meling her proposed accommodations or any other accommodations that might have permitted her to teach in the fall of 1994. St. Francis did not attempt to speak to Meling's doctors in order to clarify the extent of Meling's injuries.

In fact, Meling was fully capable of teaching all of the courses on her schedule for the Fall 1994 semester. The courses assigned to her (Kinesiology (the study of human motion), Exercise, Nutrition and Weight Control, Tae Kwon Do, Folk, Square and Social Dance and Field Experience) either involved no physical activity by the instructor or, in the case of Tae Kwon Do and Exercise, Nutrition and Weight Control, required physical demonstrations that could have been performed by students.[5]

---

**3.** "Tr." refers to the transcript of the trial held between June 30, 1997, and July 7, 1997.

**4.** Section J(4)(c) of the St. Francis Faculty Handbook provides for a maximum of one year of leave for documented, medically confirmed illnesses. On this motion, plaintiff argues for the first time that this one-year maximum disability

leave policy, on its face, violates the ADA. I need not resolve that question, since it does not concern any of the issues remaining before me.

**5.** Indeed, in the fall of 1994, Meling taught Tae Kwon Do at Manhattan College with the use of a student demonstrator.

On September 26, 1994, Meling notified St. Francis that she wished to resume her "regular teaching duties" in the Spring 1995 semester, and that she wanted to be considered for tenure. Donald Sullivan wrote back on October 20, 1994, informing Meling that she would not be placed on the schedule for the spring term. He explained that, pursuant to St. Francis' policy, since Meling was not able to "perform all duties and responsibilities as a faculty member" at the end of her one-year medical leave of absence, she was deemed to have "resigned" from the faculty.

As of June 30, 1997, when Meling testified at trial, she remained unable to stand or walk for long periods of time or to lift heavy objects. Accordingly, were she to resume teaching at St. Francis, she still would need the school to accommodate her disability by providing her with (1) a student demonstrator for courses such as Tae Kwon Do and gymnastics; and (2) an assistant to help Meling with ministerial tasks and typing. Otherwise, Meling is physically able to resume her teaching career, and she hopes to do so at St. Francis.

### Procedural History

On September 14, 1995, Meling filed this action. After the close of discovery, defendants moved for summary judgment, claiming that plaintiff's certifications to insurance carriers that she was "totally disabled" as a result of her automobile accident precluded her from asserting that she was able to perform the essential functions of her job at St. Francis. Sullivan also moved for summary judgment on the Rehabilitation Act claim on the additional ground that the Act did not impose liability on individuals. By Memorandum and Order dated April 1, 1997, I granted Sullivan's motion for summary judgment on that issue, but denied defendants' motion in all other respects. A jury trial was then held between June 30, 1997, and July 7, 1997, after which the jury determined that Meling was terminated from her employment in violation of the ADA and was entitled to compensatory and punitive damages.

### DISCUSSION

#### A. The Motion For Judgment As A Matter Of Law Or A New Trial

The evidence at trial amply supported the jury's verdict. Although defendants raise various arguments in support of their motion, only one merits extended discussion: the contention that I erred by concluding as a matter of law that Meling was disabled within the meaning of the ADA.

#### 1. The Standard For Judgment As A Matter Of Law

Rule 50(a)(1) of the Federal Rules of Civil Procedure provides, in pertinent part:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party.

Accordingly, an issue may be determined against a party if, while "drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of [the non-movant], a reasonable jury could only have found for the [movant]." *Vermont Plastics, Inc. v. Brine, Inc.,* 79 F.3d 272, 277 (2d Cir.1996). In other words, a motion should be granted if a contrary verdict could only be based on "sheer surmise and conjecture." *Cruz v. Local Union Number 3 of the International Brotherhood of Electrical Workers,* 34 F.3d 1148, 1154 (2d Cir.1994).

#### 2. Defendant's Claim That Meling Had No "Disability"

One element a plaintiff must establish in order to prevail on a claim of disability discrimination is that she is a qualified person with a "disability," as that term is defined under the ADA. *See Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 383 (2d Cir.1996). An individual is disabled under the Act if she (1) has a physical impairment that substantially limits her performance of one or more major life activities; or (2) has a record of such an impairment; or (3) is regarded by her employer as having such an impairment. 42 U.S.C. § 12102(2).

On March 22, 1993, Meling was involved in a car accident in which she suffered a variety of serious injuries that caused her to seek and receive disability leave from St. Francis for one year. In addition, both parties agree that St. Francis did not want Meling to return to work after that year unless she could "return to full duties and full responsibilities," which St. Francis believed she could not do because of her physical problems. Meling, for her part, agreed that she had physical limitations, but believed that she could teach at St. Francis if she were provided with a reasonable accommodation. Thus, there is no dispute that Meling, at the time she was terminated from her employment, had a physical impairment and was regarded by her employer as having such an impairment. Presumably, although defendants do not explicitly describe their claim in this manner, defendants dispute that Meling's impairment substantially limited her performance of one or more major life activities, even though they claim that it prohibited her from doing her job.

In interpreting the terms "major life activities" and "substantially limited," the regulations promulgated by the Department of Health and Human Services provide significant guidance. *See Heilweil v. Mount Sinai Hospital,* 32 F.3d 718, 722 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). Major life activities are "basic activities that the average person in the general population can perform with little or no difficulty." 28 C.F.R. § 1630.2(i). They include, but are not limited to, "sitting, standing, lifting, reaching ... caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* A substantially limiting impairment is one that:

significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity ... Thus, for example, an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking.

*Id.* at § 1630.2(j).

The testimony of Meling and her treating physician, Dr. Starace, established that Meling was substantially limited in the major life activities of walking, standing, sitting, reaching and lifting. Specifically, Meling testified that, in late August 1994, she had a knee problem, which caused her to limp and restricted her ability to walk (to two blocks at a time, which would take her between 5–10 minutes), sit (to between 10–15 minutes) and stand (to between 10–15 minutes). The injuries to Meling's shoulder also significantly restricted her range of motion and her ability to lift objects. Dr. Starace, an orthopedic surgeon, testified that, in August 1994, Meling had muscle and range of motion "limitations in terms of her ability to use" her shoulder, which had been operated on in June 1994. Tr. at 349. Dr. Starace also observed that Meling could not sit, stand or walk for extended periods of time due to "an internal derangement" in the knee. *Id.* at 349–50.

On his cross-examination of Meling, defendants' counsel did not seek to undermine her testimony that she was disabled. To the contrary, counsel attempted to create the impression that Meling was totally disabled and thus unable to perform the job of a physical education professor even with a reasonable accommodation. For example, defendants' counsel sought to establish that (1) Meling's sinus condition was severe and probably required surgery (or at least that St. Francis had every reason to believe that), *see* Tr. at 164–65; (2) Meling considered herself "totally disabled" and notified insurance carriers of that conclusion, *see* Tr. at 186–87, 207–09; and (3) Dr. Starace would not have agreed that Meling could work as a physical education professor had he been aware of the rigors of the job. *See* Tr. at 210–11. Counsel's cross-examination of Dr. Starace similarly did not attempt to elicit any information that would raise doubts as to the existence or seriousness of Meling's disability. To the contrary, defendants' counsel sought to show that Meling, as of August 1994, was too disabled to perform the essential functions of a physical education professor. *See* Tr. at 363–66, 368–80.

Moreover, the administration at St. Francis fully believed that Meling was physi-

cally impaired as of August 1994. *See* Tr. at 528 (Sullivan testifying that he "believed that she was too sick to perform her job"). Indeed, St. Francis' position throughout the trial was that Meling was so "physically limited" that she could not "qualify as a proper supervisor for a physical education course." *See* Tr. at 470. In short, the uncontradicted evidence elicited by both sides required the conclusion that plaintiff had a physical impairment· that substantially limited her performance of major life activities, and that defendants considered her to be so impaired and fired her for that reason. No rational juror could have concluded otherwise.[6]

### B. *The Jury's Award Of Punitive Damages*

Punitive damages are appropriate under the ADA when a plaintiff "demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1). Defendants argue that the jury's award of punitive damages of $150,000 should be set aside because plaintiff did not present even "a scintilla of evidence to establish that defendants acted with malice or with a reckless disregard to Meling's rights." Memorandum of Law in Support of Defendants' Motion For Summary Judgment as a Matter of Law at 26. I disagree, and conclude that the evidence clearly established that the defendants acted with reckless indifference to Meling's rights under the Americans With Disabilities Act.

■ At trial, defendants relied· almost entirely on the argument that Meling could not work as a *physical* education professor because she could not do *physical* work. *See* Tr. at 517 (Sullivan) ("[i]f you take a professor of physical education and you take the physical out, you end up with a professor of education. And in my judgment that's a change of job."). However, the trial testimony revealed that there are precious few physical demands actually placed on physical education professors. The vast majority of Meling's courses required no physical activity on her part, and even the courses that required demonstrations could be taught by using students to perform the required skills, a method that is preferred some academic circles even where the· instructor has no physical limitations. Indeed, without changing Meling's schedule at all for the Fall 1994 semester, Meling could readily have performed her job at St. Francis had the college permitted her to teach with the assistance of a student demonstrator.

From the moment Meling was injured, St. Francis insisted that it would permit Meling to resume working only when she could return to "full duties and full responsibilities," without any "limitations." That position,

---

**6.** Elevating the use of inconsistent arguments to an art form, defendants follow their argument that Meling had no "disability" with an argument that Meling was totally disabled and therefore not "qualified." The argument is based almost exclusively on Meling's application for and receipt of disability benefits, and borrows heavily from questionable caselaw that applies the doctrine of judicial estoppel to employment discrimination claims by persons who have sought disability benefits.

The argument is meritless. Having been cast aside by St. Francis, Meling obtained disability benefits and, in doing so, made representations to insurers that she was totally disabled. Defendants' counsel were permitted to use those representations to attack Meling's credibility at trial, and they attempted to do so without success.

Defendants also renew their claim that Meling's statements to the insurers preclude her, as a matter of law, from asserting here that she is qualified (this claim was rejected in the April 1, 1997 Memorandum and Order). The Second

Circuit has explicitly reserved the question whether judicial estoppel can have such a preclusive effect in an ADA case, *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 74 (2d Cir.1997), but the rapidly growing weight of authority rejects defendants' argument. *See, e.g., Griffith v. Wal-Mart Stores*, 135 F.3d 376, 381 (6th Cir.1998); *Talavera v. School Board of Palm Beach County*, 129 F.3d 1214, 1220 (11th Cir.1997); *Swanks v. Washington Metro. Area Transit Auth.*, 116 F.3d 582, 586 (D.C.Cir.1997). The one court of appeals decision supporting defendants' claim— the Third Circuit's decision in *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 620 (3rd Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997)— may still be the law there, but it has recently been placed on death row by the Third Circuit itself. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 502–03 (3d Cir. 1997). The issue is not raised here, as Meling's representations were not made to an administrative agency, but if it were I would reject St. Francis' argument based on the persuasive analysis set forth in *Swanks*.

which St. Francis faithfully maintained throughout its communications with Meling, simply defies the ADA, which requires employers to make reasonable accommodations for disabled employees. St. Francis did not seek advice from anyone with respect to its obligations under the ADA or to the meaning of a "disability" or a "reasonable accommodation." *See* Tr. at 484–85. It did not seek clarification from Meling's doctors of her medical problems, even though Hawes was not clear as to the extent of her injuries. *See* Tr. at 483. It did not make any attempts to assist Meling in returning to work under any conditions. Indeed, no one involved in the decision to fire Meling ever discussed with other physical education professors at St. Francis the demands of their job or whether adjustments could be made to accommodate Meling. To the contrary, when Dr. Sullivan reviewed Meling's letter on September 7, which proposed certain potential accommodations, he sent off a response that same day that informed Meling that St. Francis was "doubtful that someone physically limited could qualify as a proper supervisor for a physical education course." Tr. at 99.

In short, St. Francis did nothing to ensure compliance with the ADA. It decided that since Meling had physical limitations, it would rather hire someone else. It was out of step with the law, and stayed that way even after the requirements of the law were brought to its attention. Such defiance of the ADA supports the imposition of punitive damages. Accordingly, I uphold the jury's award.

## C. *Back Pay*

Defendants seek to avoid an award of back pay to Meling. In the alternative, they contend that I should reduce the back pay award to plaintiff (1) by $25,500, the amount she received in disability benefits from Teachers Insurance Annuity Association ("TIAA"); (2) by any amounts she claims subsequent to June of 1995, when she was allegedly "totally disabled" and thus unable to teach at St. Francis; and (3) by an amount that reflects her failure to actively seek alternative employment. I reject all of these arguments.

Ordinarily, a plaintiff who establishes she has been unlawfully terminated is entitled to an award of back pay from the date of the termination until the date of judgment. *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 144–45 (2d Cir.1993) (Title VII), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). The purpose of a back pay award is to make whole the victim of unlawful discrimination, *Clarke v. Frank*, 960 F.2d 1146, 1151 (2d Cir.1992), not to punish an employer or provide a windfall to the employee. *See Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 412 (S.D.N.Y.1996). The award should compensate a plaintiff for the wages and benefits she lost on account of the unlawful termination of her employment.

The argument that Meling is not entitled to back pay is a rehash of defendants' meritless claim that her receipt of disability benefits established, as a matter of law, that Meling was unable to work. Defendants' contentions regarding the amount of back pay are addressed below.

### 1. *The Disability Benefits*

St. Francis sent premiums to TIAA on behalf of all of its employees, including Meling. Between September 1994 and January 1996, St. Francis paid a total of $211.10 to TIAA on behalf of Meling, which enabled her to collect a total of $25,500 ($1,500 per month). Defendants argue that the money Meling received from TIAA should be deducted from her back pay award because it stemmed directly from St. Francis' financial contributions.

In *Dailey v. Societe Generale*, 108 F.3d 451, 459–61 (2d Cir.1997), the court affirmed the district court's refusal to deduct the amount plaintiff received in unemployment benefits from her back pay award. It noted that, while "the decision whether or not to deduct unemployment benefits from a Title VII back pay award rests in the sound discretion of the district court," a "compelling reason" to exercise that discretion in favor of refusing to deduct benefit payments is that it is better to confer a windfall payment to the victim rather than the perpetrator of unlawful discrimination. *Id.* at 460–61.

■ If I deduct the TIAA benefits from Meling's back pay award, St. Francis will pay less than it would have had it not unlawfully fired Meling. On the other hand, if I refuse to deduct the TIAA benefits, Meling will receive more than she would have had she not been terminated. Selecting between these two alternatives, I prefer to confer the unavoidable windfall on the victim of discrimination. Accordingly, I refuse to deduct the TIAA benefits received by Meling from her back pay award.

### 2. Meling's Alleged Period Of "Total Disability"

Defendants correctly observe that Meling should not receive a back pay award that reflects payments during time periods in which she would not have been physically able to teach at St. Francis. However, there was no period of time during which that was the case.

■ Dr. Starace testified that Meling was unable to work in any job in June of 1995 because of a back problem that caused pain to radiate down the length of her spine. See Tr. at 357. However, that condition subsided before the start of the Fall 1995 semester, so it would not have interfered with Meling's teaching responsibilities at St. Francis. See id. at 358. Indeed, Meling taught Tae Kwon Do at Manhattan College during the fall of 1995. Id. at 108. Therefore, Meling would have been able to work at St. Francis for all relevant time periods, and her back pay award should be calculated accordingly.

### 3. Meling's Duty To Mitigate

■ The Second Circuit has stated that, "[w]hile it is the plaintiff's duty to mitigate, it is the defendant who has the evidentiary burden of demonstrating at trial that a plaintiff has failed to satisfy this duty." Dailey, 108 F.3d at 456. St. Francis may meet its burden by establishing "(1) that suitable work existed, and (2) that the employee did

not make reasonable efforts to obtain it." Id.

■ From the time St. Francis fired her until trial, Meling aggressively sought employment as a physical education professor. She sent out formal applications; she contacted placement agencies and colleagues in the profession; she consulted newsletters, job bulletins, and newspapers; she searched the Internet for job opportunities; she attended national conventions to "network"; and she kept a job search file, which detailed all of her research on potential employment opportunities. See Tr. at 130–34. Indeed, as a result of her efforts, Meling successfully obtained employment as an associate professor with Long Island University ("LIU"). She was able to work there for only a limited period of time, however, because the condition of her knee made it impossible to drive the long distances required to commute by car to the LIU campus.[7]

Accordingly, during all relevant time periods, Meling engaged in reasonable efforts to obtain alternative employment.

### 4. The Amount of Back Pay

■ Dr. Kenneth McLaughlin, an associate professor of economics at Hunter College, testified that Meling's back pay damages as of the date of trial were $146,698. After the trial, plaintiff's counsel conceded that Dr. McLaughlin had failed to account for all of Meling's income at LIU. Adjusted accordingly, the record amply supports plaintiff's claim that she is entitled to $141,251, with interest, as back pay up to the time of trial.[8] Plaintiff shall have until April 10, 1998, to supplement her application for back pay to reflect the period between trial and this decision.

### D. Reinstatement With Tenure

There is no dispute between the parties that, if the jury's verdict stands, Meling is entitled to be reinstated to her job as a

---

7. Meling's knee condition did not interfere with her ability to commute to St. Francis because, unlike with LIU, public transportation was available from her home to St. Francis College.

8. Dr. McLaughlin's assumption that Meling would have received tenure is entirely appropriate. Based on the evidence before me at trial, it was plainly a reasonable assumption. My refusal to order the grant of tenure, see infra, does not require a contrary result.

professor of physical education at St. Francis College. Plaintiff, however, seeks an order, which defendants oppose, requiring St. Francis to reinstate Meling with tenure.

█ In a variety of contexts, courts have been wary of intruding on the professional judgments of academic decision-makers. *See, e.g., Marjorie Webster Junior College, Inc. v. Middle States Association of Colleges and Secondary Schools,* 432 F.2d 650 (D.C.Cir.1970) ("noncommercial" academic decisions are exempt from antitrust scrutiny), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970). Indeed, even in the context of allegations of employment discrimination, courts must "steer a careful course between excessive intervention in the affairs of the university and the unwarranted tolerance of unlawful behavior." *Powell v. Syracuse University,* 580 F.2d 1150, 1154 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). That course is even more difficult to navigate when it comes to reviewing tenure decisions, which amount to "what is close to a life-long commitment by a university." *Lieberman v. Gant,* 630 F.2d 60, 64 (2d Cir.1980).

█ On the other hand, Meling is entitled to the full panoply of remedies available to Title VII plaintiffs, *see Sands v. Runyon,* 28 F.3d 1323, 1327 (2d Cir.1994), which includes "reinstatement or hiring of employees ... or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g)(1). As with the granting of back pay, the principle guiding the provision of equitable relief such as reinstatement is that persons should be made "whole for injuries suffered on account of unlawful employment discrimination." *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

█ Whether Meling would have received tenure had she not been unlawfully terminated by St. Francis, and thus whether the granting of such relief is necessary to make her whole, is a question that a court is ill-equipped to answer.[9] Unlike other cases, which have reviewed the legality of tenure decisions after they were made, *see, e.g., Brown v. Trustees of Boston University,* 674 F.Supp. 393 (D.Mass.1987), *aff'd in part and vacated in part,* 891 F.2d 337 (1st Cir.1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990); *Kunda v. Muhlenberg College,* 463 F.Supp. 294 (E.D.Pa.1978), *aff'd,* 621 F.2d 532 (3d Cir.1980), plaintiff asks this Court to make a tenure decision. The management of a college or university "is primarily the responsibility of those equipped with the special skills and sensitivities necessary for so delicate a task." *New York Institute of Technology v. State Division of Human Rights,* 40 N.Y.2d 316, 322, 386 N.Y.S.2d 685, 353 N.E.2d 598 (1976). Such institutions are "cultural treasure house[s]," not businesses, *id.,* and the tenure decisions they make lie at the core of their mission. Tenure protects academic freedom, which in turn fosters intellectual curiosity and diversity, preventing "a pall of orthodoxy" from descending on the classrooms. *Id.* at 323, 386 N.Y.S.2d 685, 353 N.E.2d 598 (quoting *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (internal quotation marks omitted)).

Moreover, tenure decisions are not solely driven by academic concerns. The essentially permanent employment conferred on a tenured professor produces administrative consequences that can last for several decades. Again, courts are ill-suited to consider the impact of a particular tenure decision on the present and future needs of the professor's department and the college as a whole.

At the conclusion of the trial, in light of the ample evidence that Meling is a skilled and respected member of the faculty, I expressed to the parties my view that the tenure question was solely a question of authority, *i.e.,* if I had the authority to offer it, I would. Upon further reflection, I have concluded that, despite the authority to order such relief, I nevertheless should not. Accordingly,

---

9. Moreover, it was the subject of only scant testimony at trial, since it was collateral to the issues before the jury. Indeed, although virtually every witness that testified stated that Meling was an excellent professor, whether she would have received tenure is, as Dean Hawes stated, "kind of hypothetical." Tr. at 489.

I decline to order reinstatement with tenure.[10]

## CONCLUSION

For the reasons stated above, I deny defendants' motions for judgment as a matter of law or for a new trial and to set aside the jury's award of punitive damages. The jury's awards of $225,000 in compensatory damages and $150,000 in punitive damages shall remain undisturbed. Meling is also awarded back pay in the amount of $141,251, plus interest, for the period ending on July 1, 1997. Plaintiff shall have until April 10, 1998, to supplement her application for back pay for the period from July 1, 1997, until the present. The parties are directed to confer on that issue in an effort to reach agreement on it without prejudice to defendants' right to challenge on appeal the propriety of the back pay award. In the absence of an agreement, defendant shall have until April 17, 1998, to respond to plaintiff's supplemental application. Meling is ordered reinstated to her position as Assistant Professor of Physical Education at St. Francis.

So Ordered.

---

**10.** Plaintiff also requests that, should I deny the motion to order Meling's reinstatement with tenure, I retain jurisdiction over her tenure application. However, in enacting Title VII, Congress "could not have contemplated that the courts would sit as '[Super–Tenure Review Committee(s),' " *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980) (quoting *Keddie v. Pennsylvania*, 412 F.Supp. 1264, 1270 (M.D.Pa.1976)). Moreover, I refuse to assume the worst about St. Francis' future conduct. Although my confidence in it to proceed in good faith is based in part on the fact that both Sullivan and Hawes have since retired, it is also based on the belief that the judgment

entered in this case will (provided it survives appellate review) have a positive effect on the administration at St. Francis. Thus, while it may well be true, as Meling argues, that her tenure application has been prejudiced by the hiatus attending this action, I have no doubt that there are also ways to ameliorate that prejudice in considering Meling for tenure. St. Francis has argued strenuously that it can be counted on to provide full and fair consideration of Meling's application. Should that process itself be infected with unlawful discrimination, Meling shall have her remedies. In the meantime, I will not retain jurisdiction over her case.