Rivera, J.
(concurring in part and dissenting in part). I agree, albeit for different reasons, that plaintiffs are not entitled to summary judgment on the issue of liability under the New York State Human Rights Law. In my opinion, an employer’s rejection of employment criteria in order to avoid disparate impact does not constitute statutorily proscribed intentional discrimination. As a consequence, the plaintiffs’ disparate treatment claims are without merit and should be dismissed, and the case remitted for consideration of the plaintiffs’ remaining claims. Moreover, I disagree with the majority that the “strong basis in evidence” standard set forth in Ricci v DeStefano (557 US 557 [2009]) applies to the parties’ dispute. That standard undermines the legislative purpose and stated equal opportunity goals of our Human Rights Law and we should reject it outright. I write separately to explain what I consider to be the proper approach to plaintiffs’ Human Rights Law claims.[1]
New York State is a pioneer in addressing discrimination at the workplace. In 1945, two decades before the effective date of title VII, New York enacted the Ives-Quinn Anti-Discrimination *734 Law, prohibiting discrimination on the basis of race, creed, color or national origin (L 1945, ch 118). After its enactment as the first state statute to ban employment discrimination in the private sector, the law was renamed in 1968 to the New York State Human Rights Law (L 1968, ch 958; see also Susan D. Carle, How Myth-Busting About the Historical Goals of Civil Rights Activism Can Illuminate Future Paths, 7 Stan J Civ Rts & Civ Liberties 167, 173 [2011]). Over time the legislature expanded the law’s coverage to provide maximum protection to New Yorkers, by prohibiting discrimination on the basis of age, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, and domestic violence victim status[2] (L 1975, ch 803; L 1996, ch 204; L 2002, ch 2; L 2003, ch 106; L 2005, ch 75; L 2009, ch 80; L 2010, ch 196).
The legislature intended for the Human Rights Law to protect “the public welfare, health and peace of the people” of the State of New York, “in fulfillment of the provisions of the constitution of this state concerning civil rights” (Executive Law § 290 [2]). As part of the legislative findings and statutory purpose, the Human Rights Law declares
“the state has the responsibility to act to assure[,] [inter alia,] that every individual within this state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity . . . not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants” (Executive Law § 290 [3]; see also State Div. of Human Rights v Kilian Mfg. Corp., 35 NY2d 201, 207 [1974]).
From its original enactment, the legislature adopted the lexicon of “rights-based guarantees” and declared “[t]he opportunity to obtain employment without discrimination ... to *735 be a civil right”[3] (Executive Law § 291 [1]). Since 1945, the legislature has amended the civil rights provision of the Human Rights Law several times, and on each occasion extended the provision’s anti-discrimination protections (see L 1975, ch 803 [extending the prohibition against discrimination to include discrimination on the basis of age or marital status]; L 2002, ch 2 [extending the prohibition against discrimination to include discrimination on the basis of sexual orientation]; L 2003, ch 106 [extending the prohibition against discrimination to include discrimination on the basis of military status]; L 2010, ch 196 [extending the prohibition against discrimination to include discrimination on the basis of disability]).
Further amendments to the Human Rights Law have expanded rather than contracted its scope, another indicator of the legislative intent to ensure broad coverage of the protections generally afforded under the statute (see e.g. Executive Law § 296 [1] [a], as amended by L 1975, ch 803 [adding prohibition against employment discrimination on the basis of marital status]; Executive Law § 292 [21], as amended by L 1979, ch 594 [expanding scope of Human Rights Law protection by broadening range of disabilities within coverage]; Executive Law § 298-a, as added by L 1975, ch 662 [amending the Human Rights Law to reach acts of discrimination occurring outside the state]).
Undeniably, the statute is an expression of New York State’s commitment to equality within society, based on anti-discrimination principles. It reflects what this Court has recognized is the “State’s strong and important public policy against discrimination” (New York Inst. of Tech. v State Div. of Human Rights, 40 NY2d 316, 324-325 [1976]).
The Court has broadly interpreted the Human Rights Law consistent with the statutory mandate that “[t]he provisions of [the Human Rights Law] shall be construed liberally for the accomplishment of [its] purposes” (Executive Law § 300; see e.g. 300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 183 [1978] [liberal construction of Human Rights *736 Law guided determination of whether substantial evidence supported decision of New York Division of Human Rights]; City of Schenectady v State Div. of Human Rights, 37 NY2d 421, 428 [1975] [relying on liberal construction of the Human Rights Law to reject argument that City and Police Department should not be liable where independent board they created discriminated on the basis of sex]; New York Inst. of Tech., 40 NY2d at 324-325 [liberal construction supported granting Division of Human Rights power to grant professor tenure]). Indeed, it is “the duty of courts to make sure that the Human Rights Law works and that the intent of the Legislature is not thwarted by a combination of strict construction of the statute and a battle with semantics” (City of Schenectady, 37 NY2d at 428). To that end, the Court has held that “an employment practice neutral on its face and in terms of intent which has a disparate impact upon a protected class of persons violates the Human Rights Law unless the employer can show justification for the practice in terms of employee performance” (People v New York City Tr. Auth., 59 NY2d 343, 348-349 [1983], citing Matter of Sontag v Bronstein, 33 NY2d 197, 201 [1973]; City of Schenectady, 37 NY2d at 429, citing New York State Div. of Human Rights v New York-Pa. Professional Baseball League, 36 AD2d 364, 367 [4th Dept 1971]).
As a precursor to the 1964 Civil Rights Act, the Human Rights Law is not modeled on title VII, and has certain significant distinctions that extend its coverage beyond that of title VII. For example, the Human Rights Law prohibits employment discrimination on additional grounds of sexual orientation, predisposing genetic characteristics, marital status, domestic violence victim status, and certain arrest or criminal accusation records (compare Executive Law § 296 [1] [a]; [16] with 42 USC § 2000e-2). In addition, the Human Rights Law applies to more employers than does title VII. The Human Rights Law covers employers with at least four employees, while title VII is limited to employers with at least 15 employees (compare Executive Law § 292 [5] with 42 USC § 2000e [b]). However, title VII affords greater financial relief than the Human Rights Law by providing for punitive damages and attorney’s fees (42 USC § 1981a [b] [1] [providing for punitive damages]; 42 USC § 2000e-5 [k] [providing for attorney’s fees]).
Nevertheless, the Human Rights Law and title VII are generally consistent, with similar language and goals. Indeed, the Court has recognized that “[t]he standards for recovery under *737 [the Human Rights Law] are in accord with Federal standards under title VII” (Ferrante v American Lung Assn., 90 NY2d 623, 629 [1997]). The Court has concluded that “[b]ecause both the Human Rights Law and title VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful” (Forrest v Jewish Guild for the Blind, 3 NY3d 295, 305 n 3 [2004], citing Matter of Aurecchione v New York State Div. of Human Rights, 98 NY2d 21, 26 [2002]).
Here, however, we are not presented with a federal standard recognized previously by our courts as “in accord” with the Human Rights Law (Ferrante, 90 NY2d at 629). Rather, the question in this appeal is what standard applies to the plaintiffs’ state law claims. Relying on the Court’s prior application of federal law, but without significant analysis of the propriety of doing so in this case, the majority agrees with the courts below that the “strong basis in evidence” standard applicable under title VII as announced in Ricci should also apply to the plaintiffs’ Human Rights Law claims (majority op at 730-731). However, before adopting this standard we must carefully scrutinize the text and intended purpose of the Human Rights Law to ensure that the federal approach under title VII is best suited to further our State’s law and policy.
In the past, the Court has “attempted to resolve federal and state employment discrimination claims consistently” (Aurecchione, 98 NY2d at 25, citing Ferrante, 90 NY2d at 629). In light of the federal and state statutory alignment and our Court’s past treatment of federal law, any departure from federal analysis requires close consideration. Our rejection of the federal approach should be limited to those rare cases where federal interpretations of title VII are at odds with, or undermine, the text or legislative goals of the Human Rights Law. For example, where the federal standard contracts rather than expands the application of the statute, or places the well-established legislative goal of equal opportunity in jeopardy, federal case law provides little guidance. Moreover, if the federal standard is a significant break from our prior approach we must consider if avoidance of the federal analysis is warranted as a matter of state law.
In my opinion, the instant appeal presents the rare case where we must reject the federal “strong basis in evidence” standard because it is in contravention of the legislative intent and goals *738 of the Human Rights Law to ensure equal opportunity at the workplace. The federal approach essentially subordinates the interests of plaintiffs alleging disparate impact to those of plaintiffs claiming disparate treatment. According to the majority and dissent in Ricci, the standard conceives of a contest between individual claims of intentional discrimination, i.e. disparate treatment claims, and efforts to avoid liability for employment practices with disparate effects, i.e. disparate impact claims (see Ricci, 557 US at 580-582 [Kennedy, J.]). As the dissent in Ricci argues, this is an incorrect view of title VII and federal case law (Ricci, 557 US at 624 [Ginsburg, J., dissenting] [“Neither Congress’ enactments nor this Court’s Title VII precedents . . . offer even a hint of ‘conflict’ between an employer’s obligations under the statute’s disparate-treatment and disparate-impact provisions”]). I too find that there is no contest between these two branches of discrimination theory, and therefore would find that the standard has no place in our interpretation of the Human Rights Law.
Anti-discrimination law posits just the opposite of the standard as conceived in Ricci, because Ricci treats the choice to reject criteria that has discriminatory results as an exercise in wrongful discrimination, while anti-discrimination law focuses on a society free of the mechanisms and tools which would result in disparate outcomes. Anti-discrimination laws and statutes aimed at achieving equal opportunity in employment, like the Human Rights Law, are based on the foundational principle that a workplace conceived and established in accordance with practices that result in disparate effects is harmful and unlawful. Hence, claims that rely on the reenforcement of employment criteria that results in a disparate impact are devoid of a sound legal or public policy grounding.
Under the Human Rights Law, no individual has a stake in a work force selected and maintained through the use of criteria that result in proscribed disparities. A work force so constituted is antithetical to the statute’s concept of equal opportunity, and the right to employment purged of discrimination (Executive Law § 296). Moreover, a workplace structured to further inequality violates the Human Rights Law because it “threatens the rights and proper privileges of [New York State’s] inhabitants [and] menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants” (Executive Law § 290 [3]). Since an employer does not commit statutorily *739 proscribed intentional discrimination when the employer seeks to reduce and eliminate the causes of inequality at the workplace, the Ricci standard cannot guide our resolution of the issues presented in this appeal.
Another reason why we should reject the federal approach is because it discourages an employer’s voluntary compliance out of fear the employer will be unable to establish “the strong basis in evidence” necessary to avoid liability for disparate treatment claims. By requiring more than prima facie evidence of disparate impact established by statistical disparities at the workplace, the standard imposes a heavy burden on employers, which ultimately leads to employer inaction. Obviously, the costs of litigation and the impact on municipal functions puts significant pressure on a municipal employer to avoid litigation. As amici argue in support of the City, “[p]rotracted employment litigation . . . has a highly disruptive effect on the provision of vital public services that goes well beyond the havoc [wreaked] on the public fisc” (brief for International Municipal Lawyers Association as amicus curiae at 20). Thus, the federal approach incentivizes employers to maintain the status quo, and retain employment criteria regardless of the disparate effects, in contravention of the Human Rights Law’s goals of ensuring “that every individual within this state is afforded an equal opportunity to enjoy a full and productive life” (Executive Law § 290 [3]), and discrimination-free employment (Executive Law § 291 [1]). Rather than encourage employers to adopt tests and employment practices which ensure equal access to jobs, the federal standard does just the opposite.
The appeal before us is an example of why the federal standard is ill-suited to ensure compliance with the Human Rights Law. As the majority points out, the City of Buffalo has historically discriminated in employment for jobs within the fire and police departments (majority op at 727-728). The consequences of its actions were so severe and obvious that the United States government sued to bring it in line with federal anti-discrimination laws. The remedial order enjoined the City
“from engaging in any . . . practice with respect to hiring, assignment, promotion, transfer, training or compensation which has the purpose or effect of discriminating against any employee . . . with . . . the Buffalo . . . Fire Department because of such individual’s race, sex or national origin, nor will *740 they engage in any other acts or practices which deny to blacks, [Hispanics] or women equal employment opportunities” (final decree and order of Nov. 23, 1979 ¶ 1).
When the City applied tests which resulted in racial and ethnic disparities in promotional practices, it was sued by Members of Color Helping All (MOCHA). In the course of defending these practices and tests, the City was presented with opinions from its own expert and the plaintiffs’ expert that the method used to validate the examinations was flawed. The City’s expert concluded that “the scientific evidence supporting the validity of [the examination] was limited” and “it might not be in the City’s best interest to call [her] to testify.” She further concluded that there was a substantial risk that the MOCHA plaintiffs would prevail. Faced with a choice to continue using a promotion tool criticized as flawed, or abandoning a test whose methodology was contested even by the City’s own expert, the Commissioner chose to forgo any further use of the eligibility list created based on the invalid examination.
The Commissioner’s actions were in full compliance with the Human Rights Law and disparate impact theory as adopted by this Court (see Executive Law § 296; New York City Tr. Auth., 59 NY2d at 348-349; City of Schenectady, 37 NY2d at 429; Bronstein, 33 NY2d at 201). Yet, under the federal standard, the City would be liable for employment discrimination if it fails to establish “a strong basis in evidence that, had it not taken the action, it would have been liable” for disparate impact discrimination under title VII (Ricci, 557 US at 563). This is a real possibility given the majority concludes that, despite the existence of expert evidence of actionable disparate impact, the City may be unable to establish the Commissioner’s motives were nondiscriminatory in nature. Thus, even though the City did not incur liability in the MOCHA federal action, it is unclear whether it will prevail in this case.[4]
As a last point, I note that the federal standard has the potential to create an untenable situation for employers sued by different parties, under different theories, seeking conflicting outcomes. An employer could find itself taking positions in liti *741 gation which appear contradictory, to its detriment. For example, here, the City defended the use of the eligibility examinations in the federal lawsuit, even after it had evidence from its own expert that the examination was flawed. Nevertheless, the City argued in the instant case, in reliance on that very same expert evidence, that the Commissioner allowed the eligibility lists to expire because he believed the tests were invalid. The plaintiffs in the state action understandably sought to exploit these facially divergent positions, and challenged the Commissioner’s credibility based on the content of his statements in the two lawsuits. Indeed, the majority accepts that the differences in the Commissioner’s testimony in 2006 from that provided in 2010 raises a question as to his motives.
Aside from whether as a legal matter the City’s positions in the two lawsuits can be justified and harmonized, it is difficult to see how adoption of a standard that creates such potential conflict is within the spirit of the Human Rights Law. It seems a disservice to the goal of equal opportunity to expend municipal and judicial resources in litigation that apparently lacks legal merit.
The Court has historically considered federal case law in deciding questions regarding the proper interpretation and application of the Human Rights Law. We should continue to do so in the future, except in the rarest of cases where the federal approach undermines the clearly stated and well-established purpose and goals of the Human Rights Law. I believe the federal standard adopted by the majority is not in accord with the anti-discrimination equality principles upon which the Human Rights Law is based, and, in contravention of the law, encourages employers to retain invalid, discriminatory employment criteria.
Judges Read, Pigott and Abdus-Salaam concur; Judge Read in a separate concurring opinion; Judge Rivera concurs in part and dissents in part in an opinion; Judges Stein and Fahey taking no part.
Order modified, without costs, by remitting to Supreme Court, Erie County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

. Plaintiffs’ challenges under the State Constitution are not at issue in this appeal and I express no opinion on the merits of those claims.

. Under the Human Rights Law, it is an unlawful discriminatory practice
“[f]or an employer or licensing agency, because of an individual’s age, race, creed, color, national origin, sexual orientation, military . status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment” (Executive Law § 296 [1] [a]).

. The civil rights provision of the Human Rights Law also recognizes as a civil right “[t]he opportunity to obtain education, the use of places of public accommodation and the ownership, use and occupancy of housing accommodations and commercial space” (Executive Law § 291 [2]). It further declares that “[t]he opportunity to obtain medical treatment of an infant prematurely born alive in the course of an abortion shall be the same as the rights of an infant born spontaneously” (Executive Law § 291 [3]).

. The federal district court concluded that the City established that the 1998 examination was “job-related . . . and consistent with business necessity” (M.O.C.H.A. Socy., Inc. v City of Buffalo, 2009 WL 604898, *18, 2009 US Dist LEXIS 20070, *55-56 [WD NY Mar. 9, 2009, No. 98-CV-99C], affd 689 F3d 263 [2d Cir 2012]).